IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Angelia J. Igoe, | ) | C/A No.: 1:11-2917-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein..

I.     Relevant Background

A.     Procedural History

On March 15, 2007, Plaintiff protectively filed an application for SSI under the Social Security Act ("the Act"), 42 U.S.C. §1381–1383(c), alleging disability due to depression and back pain. Tr. at 125. In her application, she alleged her disability began

on January 15, 2001.  *Id.*  Her application was denied initially and upon reconsideration.

Tr. 24–27, 56–59, 63–65.   On August 7, 2009, Plaintiff had a hearing before

Administrative Law Judge ("ALJ") Richard Vogel.  Tr. at 520–46 (Hr'g Tr.).  The ALJ

issued an unfavorable decision on December 4, 2009, finding that Plaintiff was not

disabled within the meaning of the Act.  Tr. at 14–23.   Subsequently, the Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the final

decision of the Commissioner for purposes of judicial review.  Tr. at 2–4.  Thereafter,

Plaintiff brought this action seeking judicial review of the Commissioner's decision in a

complaint filed on October 26, 2011.  [Entry #1].

> B.     Plaintiff's Background and Medical History

>> 1.     Background

Plaintiff was born in 1967 and was 42 years old at the time of the hearing.  Tr. at

82, 22.  She completed high school and has past relevant work ("PRW") as a paralegal

and pharmacy technician.  Tr. 90, 100, 126, 132, 523.  She alleges she has been unable to

work since 2001.  Tr. at 125, 524.

>> 2.     Medical History

Plaintiff underwent four surgeries on her low back and three on her neck.  Tr. at

223.  Her first low back surgery was in 2001.  Tr. at 525–27.  Her first neck surgery was

in 2003 or 2004, following a motor vehicle accident.  Tr. at 413, 417, 528–29.  She

subsequently had neck surgeries in January and April 2006.  Tr. at 364–65, 424–27, 426–

27, 432, 440–41, 529; *see also* Tr. at 367, 420–21, 431, 440–45 (follow-up appointments

2

from February to May 2006).  The record also reflects that Plaintiff received medications for depression and anxiety.  Tr. at 348, 374.  Plaintiff's relevant medical history is summarized below.

In March 2004, Dr. Stephen Rawe performed an anterior cervical diskectomy and fusion ("ACDF") at Plaintiff's C4–C5.  Tr. 413–417.  Plaintiff received epidural steroid injection therapy with Dr. Duc in 2005.  Tr. at 413.  In February 2006, Dr. Sunil Patel at the Medical University of South Carolina ("MUSC") performed an additional ACDF at Plaintiff's C6–C7.  Tr. at 417.  In April 2006, Plaintiff underwent revision surgery of her ACDF at C5–C6, with additional arthrodesis at C6–C7 and instrumentation removal at C5–C6.  Tr. at 364–65, 426–27.

According to a report dated December 21, 2005, Plaintiff was seen in follow-up for depression which she been experiencing for the previous six months, with her symptoms including anhedonia, hypersomnia, crying spells, fatigue, sadness, and weight gain.  Tr. at 374.  Plaintiff reported her symptoms as "constant and overwhelming."  *Id.* She had a very flat affect and exhibited suicidal ideation.  *Id.*  Plaintiff was assessed with depression and prescribed Effexor.  *Id.*

On April 1, 2006, Plaintiff presented to Nason Medical Center ("Nason") with complaints of headaches and nausea.  Tr. at 297–98.

In May 2006, Plaintiff began seeking frequent treatment for neck pain from Dr. Patel and in the emergency room ("ER"), where she often received narcotic pain medications.  Tr. at 416, 436–39.  On May 4 and May 19, 2006, Plaintiff reported that

3

she was experiencing muscle spasms and pain between her shoulder blades.  Tr. at 419–

20.  On May 25, 2006, she reported severe posterior neck pain.  Tr. at 417.  X-rays in late

May 2006 showed excellent position of Plaintiff's bone grafts and plating and very

minimal spondylosis at C2–3 with slight anterolisthesis of C2 on C3 with flexion.  Tr. at

417.  Dr. Patel wrote a letter stating Plaintiff initially had improvement in her neck pain

following surgery a few weeks earlier, but had an acute exacerbation.  Tr. at 418.  He

stated "no motor or sensory deficits were detected [upon examination]," and that she

"seem[ed] to have full range of motion in her neck without restriction."  *Id.*  He

prescribed medication and recommended she wear a cervical collar for a while longer.

*Id.*

A May 2006 MRI of Plaintiff's neck did "not reveal any kind of acute pathology."

Tr. at 436–37.  It "did not show any kind of cervical stenosis . . . the spinal cord is free.

There [are] no areas of impingement, herniated disc, or foraminal stenosis."  Tr. at 428.

On June 9, 2006, Plaintiff saw Dr. Patel in follow-up, and he reported that she was

"in a tremendous amount of muscle spasm in her lower neck."  Tr. at 415.  X-rays of the

neck showed good fusion and an MRI showed no new disc herniation or problems and no

nerve root compression.  *Id.*  Dr. Patel noted that Plaintiff had full range of motion of her

neck with no limitations, normal strength in her arms and legs, intact reflexes and intact

muscle tone.  *Id.*  He stated, "[s]he has gotten in to the habit of taking a lot of narcotics

now and makes visits to the ER apparently also.  I have told her to lay away the narcotics

and I have not prescribed any more." *Id.* He prescribed non-narcotic medications and physical therapy and noted that Plaintiff would "eventually get better." Tr. at 415.

On June 23, 2006, Plaintiff saw George Guldan, III, M.D., at the MUSC Pain Management Clinic ("Pain Clinic") with complaints of cervical spine pain and increased numbness in her left hand. Tr. at 413–14. Plaintiff reported sleep disturbance due to neck pain and reported taking Cymbalta and Klonopin. *Id.* On examination, she had some tenderness in her shoulder muscles and slightly reduced (4/5) strength and numbness in her left hand, but had otherwise normal strength, a normal gait, intact cranial nerves, normal reflexes, and intact sensation. *Id.* Plaintiff was assessed with cervical postlaminectomy syndrome, cervical radiculitis, and myofascial pain. Tr. at 414. Dr. Guldan administered a steroid injection in Plaintiff's left hand. *Id.*

A few days later, on June 27, 2006, Plaintiff saw Dr. Arthur Smith at the Pain Clinic, and he administered trigger point injections. Tr. at 412. Dr. Smith noted that Plaintiff exhibited a depressed affect at the time of her examination. Tr. at 412–413.

On July 7, 2006, Dr. Patel noted that Plaintiff "constantly comes to emergency rooms for narcotics. We have done repeat studies of her cervical spine and really cannot explain her symptoms . . . I know for one thing I cannot help her anymore." Tr. at 411.

On August 15, 2006, Plaintiff saw neurologist David Stickler, M.D., at the MUSC Department of Neurology with complaints of muscle tenderness that had not improved from her trigger point injections. Tr. at 407. On examination, she had flat affect, but otherwise normal mental status with normal recall and fund of knowledge. *Id.* She had

limited neck range of motion, but was in no acute distress and had a normal, but slightly antalgic gait, normal muscle bulk and tone, normal strength and sensation except for the left hand, normal reflexes, normal finger to nose coordination, and normal fine motor movements of the hands. *Id.* Dr. Stickler recommended electrodiagnostic testing and screening for inflammatory connective tissue disease. *Id.*

On November 16, 2006, Plaintiff sought treatment at Nason for headaches, dizziness, weakness, and vomiting. Tr. at 285–89. On December 12, 2006, and December 29, 2006, Plaintiff returned to Nason with complaints of facial pain and severe headaches. Tr. at 302–03, 340.

Plaintiff was hospitalized for a urinary tract infection from November 18, 2006, to November 20, 2006. Tr. at 356–60, 389–404.

From January 2007 to January 2008, Plaintiff sought emergency treatment numerous times from three different hospitals (East Cooper Regional Medical Center ("ECRMC"), Nason, and MUSC). Her complaints included neck and/or back pain (Tr. at 449–51, 461–62, 468–75, 494–95, 515–16), chest pain (Tr. at 192–95, 458–60), urinary tract infections (Tr. at 176–77, 187–91), foot swelling and shortness of breath (Tr. at 179–86), migraine headaches (Tr. at 164–66, 176–77, 255–59, 263–66, 506–07), depression (Tr. at 486–90), leg swelling (Tr. at 492–93), abdominal pain (Tr. at 496–97, 500), and pain after falling on some stairs (Tr. at 169–75). Test results were generally unremarkable. Tr. at 181, 183, 192, 313 (chest x-rays), 182 (abdominal x-rays), 192 (abdominal ultrasound), 184 (electrocardiography (ECG)), and 171 (left knee x-ray).

Plaintiff received narcotic pain medications on several occasions.  *See, e.g.*, Tr. at 172, 177, 195.

From January to September 2007, Plaintiff also received routine care from George Durst, M.D., a family practitioner.  Tr. at 204–18, 348–53.  Her complaints to him included pedal edema (Tr. at 204), shortness of breath (Tr. at 204), light-headedness (Tr. at 212), panic attacks (Tr. at 214, 348–53), depression (Tr. at 214, 355), and a rash (Tr. at 216, 218).  Examinations showed she was obese, had clear lungs, and, at times, had a flat or tearful affect.  Tr. at 204, 212, 215, 217.

On March 1, 2007, Plaintiff presented to Dr. Durst's office for panic attacks not controlled by medications.  Tr. at 352–53.  Plaintiff was assessed with depression and anxiety, prescribed Seroquel and Klonopin, and referred to a psychiatrist.  *Id.*

On March 5, 2007, Plaintiff returned to Dr. Durst's office for continuing panic attacks and assessed with depression and anxiety.  Tr. at 350–51.  She was again referred to a psychiatrist.  Tr. at 351.

On March 20, 2007, Plaintiff reported panic attacks to Dr. Durst and a psychiatric referral was mentioned again.  Tr. 348–49.

On April 8, 2007, Plaintiff sought treatment at Nason for a migraine headache.  Tr. at 255, 300.

On April 18, 2007, state-agency consultant Edward Waller, Ph.D., reviewed the evidence and completed a psychiatric review technique ("PRT").  Tr. at 227–40.  He opined that Plaintiff had non-severe depression secondary to her physical problems.  Tr.

7

at 227, 230.   He found that Plaintiff was experiencing mild restrictions of activities of daily living ("ADLs"); mild difficulties of maintain social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 237.

On May 4, 2007, Plaintiff followed up with Dr. Patel, who noted that she had been doing quite well until about two weeks earlier when her pain was exacerbated, and that she still did not have any radicular pain.  Tr. at 454.  On examination, Dr. Patel found no deficits: Plaintiff had normal grip and strength, normal sensation, a normal gait, and normal coordination.  *Id.*  An MRI showed that the surgical fusion was fine, and that there was no impingement of the canal anywhere.  Tr. at 455.  Dr. Patel concluded, "I do not know what to do for her.  I do not see any surgical pathology.  She does have some neck pain, probably from the increased strain on the cervical muscles from previously having had fusions."  Tr. at 454.  He recommended physical therapy, muscle relaxant medications, and other conservative measures.  *Id.*

On June 5, 2007, Dr. Douglas E. McGill conducted a consultative examination on Plaintiff at the request of the South Carolina Disability Services.  Tr. at 223–24.  Dr. McGill reviewed Plaintiff's medical records and examined her, noting that she was experiencing pain in her neck running from the top of her head and pain in her low back and lower legs.  Tr. at 223–24.  Plaintiff complained of constant pain and said the only thing that helped was lying down.  Tr. at 223.  She said she could manage her self-care and drive and that her son and niece helped with house cleaning.  Tr. at 224.  Upon

examination, Plaintiff was alert and oriented with a blunted affect and had little verbalization. Tr. at 224. She was able to get on and off of the examination table without difficulty and had a normal gait, intact ability to balance, intact cranial nerves, clear lungs, normal heart rate and rhythm, normal reflexes, intact sensation to light touch, and normal range of motion except for her trunk and neck. Tr. 224, 225–26. She was able to sit without discomfort. Tr. at 224. Dr. McGill stated that Plaintiff had symptoms of chronic pain syndrome and depression that might affect her functional abilities, but that the examination was "without focal neurological findings." *Id.*

Lumbar spine x-rays on June 5, 2007, showed evidence of her prior back surgery and caudal spondylosis involving L3–4 with displaced facets encroaching on the neuroforamina. Tr. at 276.

On June 13, 2007, state-agency consultant Charles Fitts, M.D., completed a physical residual functional capacity ("RFC") assessment in which he opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could sit, stand, or walk about six hours in an eight-hour workday; could frequently balance and stoop; could occasionally climb ramps and stairs, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; was limited in reaching in all directions; and should avoid concentrated exposure to hazards. Tr. at 241–48.

In early August 2007, Plaintiff sought treatment at the MUSC ER for neck and left arm pain. Tr. at 466, 468–475, 477–481. She received a referral to a neurologist. Tr. at 466, 470–71. An MRI showed no evidence of acute disease and x-rays showed stable

appearance of known surgical changes with no evidence of acute fracture or misalignment.  Tr. at 467, 476.

On August 17, 2007, Plaintiff followed up with Dr. Patel who noted that "[q]uite to our surprise, the Robaxin seems to be working well and she got a prescription for refills from me today.  This is the best she has ever been.  She has a lot less spasm in her neck and is doing well with the current regimen."  Tr. at 484.

On August 28, 2007, Plaintiff sought treatment from the ECRMC ER for a migraine headache.  Tr. at 164–65.

On September 17, 2007, Plaintiff telephoned MUSC to say that she was in a lot of pain and very upset, and she informed the RN to whom she spoke that she had previously attempted suicide and could not trust herself at the present time.  Tr. at 490.  The RN instructed her to call someone if she felt she was going to hurt herself, and also advised her to go to the ER for psychiatric evaluation.  *Id.*  She was further instructed to go to Charleston Mental Health, as this facility was felt to be better equipped to deal with her psychological problems.  *Id.*

On September 18, 2007, Plaintiff sought treatment for depression and panic attacks from Dr. Durst.  Tr. 214–15.  The doctor noted that Plaintiff complained of increasing anxiety since the morning that was not controlled with medication.  Tr. at 214. He indicated that her anxiety disorder had been diagnosed more than five years previously and recommended a follow-up visit in one week.  Tr. at 214–15.

Plaintiff returned to Dr. Durst on September 25, 2007, complaining of a rash and anxiety.  Tr. at 219–21.  Dr. Durst noted that Plaintiff stated that if she went home, "she [was] afraid of what she [was] capable of doing."  Tr. at 219.  He recommended hospitalization and noted a previous hospitalization for depression and anxiety in 2002. Tr. at 219–21.

Plaintiff was subsequently hospitalized at ECRMC for depression, anxiety, and suicidal ideation.  Tr. at 158–59.  She appeared sad and had a flat affect, but had normal speech, consciousness, orientation, attention, memory, judgment, and thoughts.  Tr. at 158–59.  The physician diagnosed anxiety, depression, and pruitus (itchy skin), and prescribed Ativan (anti-anxiety medication).  Tr. at 159.

On October 14, 2007, Plaintiff returned to the MUSC ER with complaints of neck pain and severe headaches.  Tr. at 494–95.

On October 23, 2007, Plaintiff returned to the MUSC ER and was administered an infusion for hydration and pain management control.  Tr. at 496–99.

In November 2007, state-agency consultant William Cain, M.D., completed a physical RFC assessment in which he opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could sit, stand, or walk about six hours in an eight-hour workday; could frequently balance and stoop; could occasionally climb ramps and stairs, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; was limited in reaching in all directions; and should avoid concentrated exposure to hazards.  Tr. at 140–47.

On November 20, 2007, Plaintiff was seen by Dr. Ashok Patel and Dr. Saima Athar at MUSC Neurology for complaints of a recent increase in the frequency and duration of headaches, with her current migraine lasting for three days.  Tr. at 502. Plaintiff's physical and mental examinations were normal except for decreased reflexes in the left foot.  Tr. at 503–04.  She was diagnosed with migraine headaches with a "medically intractable" cervicogenic component. Tr. at 505.  Plaintiff was prescribed Phenergan, Lyrica, Flexeril, and Amerge for her headaches.  *Id.*  The physician also ordered a sleep study.  *Id.*

Plaintiff sought treatment at Nason for migraines on November 23, 2007.  Tr. at 263.

On November 30, 2007, Plaintiff underwent testing at the MUSC Sleep Center, and was diagnosed with mild sleep apnea.  Tr. at 509–10.  Plaintiff was advised to avoid sleeping in a supine position and told to lose weight.  Tr. at 510.  Plaintiff was cautioned not to drive, work at heights, or operate dangerous equipment when she was tired or sleepy.  *Id.*

On January 1, 2008, Plaintiff returned to the MUSC ER with complaints of upper back pain.  Tr. at 515.

On January 3, 2008, Plaintiff was examined by Dr. Athar at MUSC Neurology for the sleep study.  Tr. at 517–19.  Plaintiff appeared anxious, but was alert and oriented with appropriate memory, attention, and language.  Tr. at 517.  She had a normal gait; intact cranial nerves; intact sensation; and normal muscle bulk, strength, and tone.  *Id.*

The neurologist diagnosed mild sleep apnea.  Tr. at 509–11.  Plaintiff was advised to lose weight and decrease her caffeine intake to help with her mild sleep apnea.  Tr. at 18.

On September 27, 2009, Dr. Michael Smith completed a Physical Capacities Evaluation, in which he opined that Plaintiff could sit one hour at a time for up to four hours a day; stand one hour at a time up to two hours a day; walk one hour at a time up to two hours a day; lift/carry up to 10 pounds frequently and 20 pounds occasionally; never climb, bend, squat, kneel, crawl, reach above shoulder level, or twist.  Tr. at 550–52.  He said her pain would likely affect her ability to concentrate and that her pain medication could impair her function and judgment.  Tr. at 551.  He said she would need unpredictable breaks, could not work eight hours a day five days a week, and would miss more than four days of work per month.  Tr. at 552.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the Administrative Hearing, Plaintiff testified that she had undergone four operations on her back and three surgeries for her neck, with the last operation occurring in 2006.  Tr. at 524, 526.  She testified that her grandmother was helping her financially. *Id.*

Plaintiff testified that she stopped working in 2001 due to her back problems.  Tr. at 525–26.  She stated she had surgery for the implantation of a spinal cord stimulator, but that she had to have surgery to take the battery mechanism out.  Tr. at 527.  She also

13

indicated that one of her surgeries involved a fusion in which bone was taken from her hip, and that she required the use of a walker following this operation.  Tr. at 528.

Plaintiff testified that she injured a disc in her cervical spine in a car accident in 2003, which required surgery.  Tr. at 528.  She testified that her initial fusion surgery did not go well and that she was consequently referred to Dr. Patel for a redo procedure.  Tr. at 529.  She testified that she had a third operation on her neck in April 2006 and had post-surgical injections at the Pain Clinic.  *Id.*  She testified that while she needed to undergo follow-up treatment, she was financially unable to do so.  Tr. at 530.  Plaintiff testified that she had previously been treated by Dr. Durst and that her current primary care physician for the previous nine months was Dr. Smith.  *Id.*

Plaintiff testified that she experienced neck pain "24/7" that radiated to her shoulder blades into her arms.  Tr. at 531.  She indicated she had migraine headaches once a month for four or five days in connection with her neck injuries that had required her to go to Nason and the ER for IV narcotics.  Tr. at 531–32.  She testified she would sleep off the migraine headaches with medication.  Tr. at 532.  She testified that her headaches sometimes lasted a week, and that the longest she had gone between headaches was about three weeks.  *Id.*  She testified that her headaches required her to lie down in a dark room and rest quietly.  *Id.*

Plaintiff testified that she still experienced discomfort in her lower back and that it was difficult for her to sit due to the rod in her tailbone area.  Tr. at 533.  She described her lower back pain as being persistent and affecting her legs.  *Id.*  Plaintiff testified that

14

she had weakness in her legs that caused them to give out and that it was difficult for her to stand or sit for any length of time. Tr. at 533–34. She also testified that it was hard to stay in one position very long and that she had to lay down on her side most of the day in order to alleviate her pain. Tr. at 534–35. Plaintiff indicated that she needed to use both hands to lift a gallon of milk and that she had problems with her grip, which caused her to drop things. Tr. at 535. She testified that her neck problems made it difficult to look up and down or side to side and that she was incapable of reaching overhead. *Id.* Plaintiff testified it was painful to bend and stoop and that she experienced stress incontinence for several years. Tr. at 536.

Plaintiff testified that she was taking medication for her psychological problems and that she had been prescribed medication for depression for about ten years, including Lithium and Klonopin, which made her very drowsy. Tr. at 538. She testified she experienced mood swings and cried all the time and that her condition caused her to have difficulties concentrating, focusing, and staying on task. Tr. at 539. She indicated that she had a difficult time being around people; that she wanted stay at home most of the time; and that she often slept during the day due to the drowsiness caused by her medication. Tr. at 539–40. Plaintiff testified that she spent a typical day watching television, preparing simple meals, and cleaning her house for 15 to 20 minute intervals. Tr. at 540. She said she went to the store with her sister and could drive, but usually chose not to do so. Tr. at 541.

Plaintiff testified that she had been hospitalized for mental health problems approximately seven or eight years earlier, and that while additional psychological counseling had been recommended, she could not afford it.  Tr. at 541–42.  She testified that she had been advised by her physicians to avoid any significant lifting, and that she should have someone with her when she is out because of the weakness in her legs.  Tr. at 542.  Plaintiff further indicated that she would have a hard time performing her previous job as a real estate paralegal due to her inability to sit for longer than 15 to 20 minutes at a time, and also because the hardware in her lower back "sends the pain up my back from my tailbone."  Tr. at 543–45.

### 2.     The ALJ's Findings

In his December 4, 2009, decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since March 15, 2007, the application date (20 CFR 416.971 *et seq.*).
2. The claimant has the following severe impairment: cervical degenerative disc disease status post surgeries ((20 CFR 416.920(c)).
3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 416.967(a).  Sedentary work involves lifting no more than ten pounds at a time and occasionally or carrying articles like docket files, ledgers, and small tools. Sedentary jobs are defined as one which involves sitting, a certain amount of walking and standing is often necessary. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met (20 CFR 404.1567).
5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.     The claimant was born on March 26, 1967 and was 39 years old, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963).

7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since March 15, 2007, the date the application was filed (20 CFR 416.920(g)).

Tr. at 17–23.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     The ALJ erred in failing to find that Plaintiff's depression and anxiety constitute severe impairments;

2)     The ALJ failed to apply the correct legal standard in assessing whether Plaintiff's medically-determinable impairments are severe;

3)     The ALJ failed to consider all relevant evidence in making his findings regarding Plaintiff's residual functional capacity;

4)     The ALJ failed to properly consider the opinions of Plaintiff's examining and treating physicians regarding the nature and severity of her impairments;

5)     The ALJ erred in relying solely on the Medical-Vocational Guidelines ("Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2,  to direct a finding that Plaintiff is not disabled, as the record establishes that she suffers from significant nonexertional limitations; and

6)     The ALJ erred in finding that Plaintiff was not disabled, as the Defendant

> failed to carry its burden of proving that there are a significant number of jobs in the national economy that she can perform.

[Entry #24 at 1–2].

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step.).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do.  The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 416.925.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a

20

reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     The ALJ's Finding That Plaintiff's Depression and Anxiety Are Non-Severe Impairments is Not Supported by Substantial Evidence

Plaintiff argues that the ALJ erred in finding her depression and anxiety to be non-severe impairments. [Entry #24 at 14–15]. The Commissioner argues that Plaintiff has not shown that these impairments are severe. [Entry #25 at 9–10]. He further contends that any arguable error by the ALJ is harmless because he considered Plaintiff's severe and non-severe impairments in the decision and explained his reasons for finding that the impairments would not impose work-related restrictions. *Id.* at 9–11.

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be

21

shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]"  20 C.F.R. § 416.908.  It is the claimant's burden to prove that she suffers from a medically-severe impairment.  *Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987).

In determining that Plaintiff's mental impairments were not severe, the ALJ noted that she had been treated with medication for her anxiety and depression, that she had not undergone any regular mental health treatment since her alleged onset date, and that she reported being able to drive, shop, care for her personal hygiene, work on the computer, and watch television.  Tr. at 19.

The ALJ's decision provides no other discussion of Plaintiff's mental impairments despite numerous medical records supporting those impairments.  Notably, within five days of her alleged onset date, Plaintiff reported panic attacks to her treating physician.  Tr. 348–49.  Tr. at 224.  In June 2007, consulting examiner Dr. McGill opined that Plaintiff had symptoms of depression that might affect her functional abilities.  *Id.*  Furthermore, in September 2007, Plaintiff reported suicidal ideations and was referred for psychiatric evaluation and hospitalization.  Tr. at 490, 214–15, 219–21, 158–59.  Plaintiff also reported panic attacks in September 2007.  Tr. at 214.  The record indicates that she was routinely prescribed anti-anxiety medication.  Tr. at 159, 348, 352–53, 374, 413–14, 538.  Because the ALJ failed to address the record evidence related to Plaintiff's mental

impairments, the undersigned is unable to conclude that his step two findings as to those impairments are supported by substantial evidence.

The Commissioner contends that any error by the ALJ is harmless because the ALJ considered Plaintiff's severe and non-severe impairments in determining her RFC. [Entry #25 at 9–11]. The undersigned agrees that an ALJ's failure to find an impairment severe at step two may be harmless where he considers that impairment at subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases). Here, however, the ALJ did not address Plaintiff's mental impairments at subsequent steps. Despite the Commissioner's contention that the ALJ considered all of Plaintiff's impairments "and explained his reasons for finding that these impairments would not impose work-related limitations of the degree alleged," the ALJ included no discussion of Plaintiff's mental impairments in the remainder of his decision.

Based on the foregoing, the undersigned is constrained to recommend that the district judge remand this case and direct the ALJ to properly consider the record evidence in determining whether Plaintiff's mental impairments are severe. The undersigned further recommends directing the ALJ to employ the special technique required by 20 C.F.R. § 416.920a.

2.      The ALJ Did Not Properly Assess Plaintiff's RFC

Plaintiff next argues that the ALJ failed to consider all relevant evidence in determining her RFC. [Entry #24 at 18]. The Commissioner counters that the ALJ properly assessed Plaintiff's RFC based on the record as a whole. [Entry #25 at 11].

Pursuant to the governing regulations, in assessing a claimant's RFC, the ALJ must consider all medically-determinable impairments, including impairments that are not severe.  20 C.F.R. § 416.945.  Thus, even if the ALJ properly found that Plaintiff's mental impairments were not severe, he was still required to consider them in determining her RFC.  At step four, the only reference to Plaintiff's mental impairments is to her testimony that she experienced crying spells and difficulty concentrating due to depression.  Tr. at 21.  The RFC assessment is otherwise devoid of any reference to Plaintiff's depression or anxiety despite the significant medical evidence referenced in the preceding section of this Report.  Consequently, the undersigned recommends finding that Plaintiff's RFC determination is not supported by substantial evidence and requires remand.

### 3.    The ALJ Erred in Relying Solely on the Grids

The ALJ's failure to adequately consider Plaintiff's mental impairments in his RFC analysis leads to a domino effect over the remainder of his decision.  After setting forth Plaintiff's RFC, the ALJ relied solely on the Grids to find Plaintiff "not disabled."

The Grids consider only the exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of her disability.  *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989).  "Exertional limitations" exist "[w]hen the limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms, such as pain, affect only [her] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. §

416.969a(b).    A nonexertional limitation "is a limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not, such as mental retardation, mental illness, blindness, deafness or alcoholism" and is "present at all times in a claimant's life, whether during exertion or rest."  *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir. 1983) (footnotes omitted).  A nonexertional limitation does not directly affect the claimant's exertional abilities—the ability to sit, stand, walk, lift, carry, push, or pull; rather, nonexertional limitations affect the mind, vision, hearing, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use the fingers for fine activities.  *See* 20 C.F.R. § 416.969a(c).  "Thus, it is the nature of the claimant's limitations, not certain impairments or symptoms, that determines whether the claimant will be found to have only exertional limitations or restrictions, only nonexertional limitations or restrictions, or a combination of exertional and nonexertional limitations or restrictions."  SSR 96–9p.

When a claimant suffers from a nonexertional impairment that restricts her ability to perform work of which she is exertionally capable, the ALJ may not rely exclusively on the Grids to establish that the claimant could perform other work that exists in the national economy.  *See Walker*, 889 F.2d at 49; *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) ("When nonexertional limitations . . . occur in conjunction with exertional limitations, the guidelines are not to be treated as conclusive." (citing *Roberts v. Schweiker*, 667 F.2d 1143, 1145 (4th Cir. 1981); 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d)-(e)(2); 20 C.F.R. § 404.1569)); *Hammond v. Heckler*, 765 F.2d 424, 425–

26 (4th Cir. 1985) ("[T]he grids inadequately describe[ ] the claimant who suffers a disability present in the absence of physical exertion."); 20 C.F.R. § 416.969a(d).  Rather, in those circumstances, the Commissioner has the burden to prove by expert vocational testimony—not exclusive reliance on the Grids—that, despite the claimant's combination of exertional and nonexertional impairments, specific jobs exist in the national economy that the claimant can perform.  *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983).

In finding Plaintiff capable of performing the full range of sedentary work, the ALJ considered her age, education, and work experience, in conjunction with the Grids. Tr. at 22.  The ALJ concluded that Medical-Vocational Rule 201.28 directed a finding of "not disabled."  Tr. at 23.  However, because the ALJ failed to address Plaintiff's anxiety and depression in his RFC assessment, he also failed to determine whether those impairments resulted in any nonexertional limitations that could potentially affect Plaintiff's ability to perform a full range of sedentary work and foreclose sole reliance on the Grids.  Plaintiff testified that she had difficulty concentrating due to depression.  Tr. at 21.  Her medical records are replete with documentation of her alleged anxiety and depression.  In addition, Dr. Smith opined that Plaintiff's pain would likely affect her ability to concentrate and that her pain medication could impair her function and judgment.  Tr. at 551.  Because the ALJ failed to adequately address the record evidence related to Plaintiff's mental impairments, the undersigned is unable to assess whether he was correct in finding that she had no nonexertional impairments.  For this reason, the undersigned recommends a finding that the ALJ's reliance on the Grids is not supported

26

by substantial evidence.  Because the ALJ erred in relying on the Grids, his step five finding that Plaintiff was capable of performing other work that exists in significant numbers in the national economy is also necessarily flawed.

### 4.    Plaintiff's Remaining Allegations of Error

Because the undersigned recommends remand based on the ALJ's failure to properly consider Plaintiff's mental impairments throughout his decision, Plaintiff's remaining allegations of error are not addressed.  However, on remand, the undersigned recommends directing the ALJ to provide greater explanation for his treatment of the opinions of Drs. McGill and Smith, particularly as they relate to Plaintiff's alleged functional limitations.  The undersigned further recommends directing the ALJ to assess whether Plaintiff's migraine headaches constitute a severe impairment and what impact, if any, they have on her RFC.

The undersigned notes that the recommendation of remand is in no way intended to suggest that the ALJ should award benefits on remand.

### III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the

Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

February 6, 2013                             Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).